## MARVIN KING AND DONALD EUGENE MOBLEY v. STATE OF MARYLAND

[No. 277, September Term, 1972.]

*Decided January 8, 1973.*

The cause was argued before MOYLAN, POWERS and GILBERT, JJ.

*Mark P. Hanley, Jr.,* for appellant Marvin King. *William A. Hahn, Jr.,* for appellant Donald Eugene Mobley.

*Josef E. Rosenblatt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Severn A. Lanier, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Peninsulas, even as do islands, pose peculiar tactical hazards to fleeing felons. The peninsula at bar was Sparrows Point. The fleeing felons at bar were the appellants, Marvin King and Donald Eugene Mobley, who, undone by the lay of the land, were convicted by Judge John Grason Turnbull, sitting without a jury in the Circuit Court for Baltimore County, of armed robbery and sentenced each to a term of eighteen years.

Both object to the search of the getaway car, which yielded the holdup gun and its ill-gotten fruits. Both question the legal sufficiency of the damning evidence.

King challenges, as well, the legality of his arrest, a contention which may be disposed of summarily. The only theory that could, in this case, legitimate the warrantless search of the automobile in which the appellants were riding is the so-called "automobile exception" and not the "search incident to arrest exception" to the warrant requirement. The arrest not having been the source of the evidence in question, its lawfulness *vel non* is devoid of all significance.

There is no challenge to the establishment of the *corpus delicti*. The scenario was routine. Akers' High's Store is located at 2413 Sparrows Point Road. Its proprietor, Mrs. Eva May Akers, was on duty on December 20, 1971, when at some time between 6 and 6:15 p.m. two Negro males entered the store. One stood by the cash register while the other stepped past the counter and asked to be directed to the potato chips. Then, at close range, he

raised a gun and said, "Keep quiet, this is a holdup." He directed Mrs. Akers to open the cash register. He removed, by her estimate, approximately $95 from the till. Both men then fled. After screaming out the door, "They robbed me," Mrs. Akers called the police. Officer Stephen Lucas, who received a call from his dispatcher at 6:15 p.m., arrived at the crime scene within several minutes. He broadcast an immediate alert, supplemented some minutes later by a more detailed lookout after he had talked with several neighbors and passersby.

The Sparrows Point peninsula is seagirt, except for its narrow northern neck, a railroad bridge, and three vehicular bridges to the westward—connecting it with Dundalk across Bear Creek. Whenever the alarm is raised that crime has occurred in Sparrows Point and that the criminals are in flight, the standard response for police on cruising patrol in Dundalk is to seize the advantage which topography bestows and to move into what are described as "the holdup positions," commanding the western approaches to the three bridges across which all outbound traffic to the westward must, perforce, be funneled.

Independently of each other, Officer Leonard Malinowski, of the Dundalk Police Department, and Officer Robert Hafer, of the Baltimore County Police Department on duty in Dundalk, both heard the first alert. They converged on the toll plaza at the western end of the Dundalk Avenue Bridge, the southernmost of the three crossings and the one which links Sparrows Point with the Turner's Station section of Dundalk. Approximately six minutes after the first broadcast, the supplemental alert furnished more descriptive detail of the two holdup men and of the fleeing vehicle. Officer Hafer pinpointed the second transmission at 6:21 p.m. Both officers had noticed the appellants' vehicle pass through the toll plaza, westbound, between ten seconds and thirty seconds prior to the second transmission. Both gave immediate pursuit.

Officer Hafer hailed down the car within several blocks. The car contained not two but three Negro males. King

was in the right front seat. Mobley was on the rear seat. The driver was a co-defendant, Lancy Raydell Cash.[1] All three suspects were frisked. The frisks produced nothing. A quick survey of the interior of the automobile revealed nothing. The three suspects were directed to re-enter their automobile and to proceed, in tight convoy with one police car in front and the other behind, to the Dundalk Police Station. The suspects were there placed in different rooms. Officer Hafer, with a detective, then executed a more thorough search of the car. The front seats of the vehicle were bucket seats, separated by what was described as a "console." It was covered with chrome plate. The searching officers noticed that the screws or rivets along the top and rear of this console had been removed so that the chrome plate could be pulled back. A small "well" or storage area was discovered underneath the loose plate. From that hiding place, the searching officers recovered a black pistol and approximately $115 in bills. The appellants claim this search to have been unconstitutional.

The warrantless search of an automobile, under appropriate circumstances, is a long recognized exception to a fundamental proposition. That proposition is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U. S. 347, 357; *Brown v. State*, 15 Md. App. 584, 586. The "automobile exception" was specifically established in 1925, *Carroll*

---

1. The State entered a stet to the charges against Cash and had him available at the trial of the appellants, apparently simply for purposes of being identified as one of the two principals in the first degree who actually went into the High's Store. After a spirited disagreement between the Assistant State's Attorney and the trial judge as to the applicability of the sequestration rule to a nontestifying object of identification, the State did not use Cash for any purpose. It is to be regretted that the eyewitnesses were not asked to identify Cash. His identification as a perpetrator would have been a strong link in the chain of circumstances tending to confirm the criminal agency even of others in whose company he was arrested minutes after the crime.

*v. United States,* 267 U. S. 132, and it has been well delineated, *Chambers v. Maroney,* 399 U. S. 42; *Coolidge v. New Hampshire,* 403 U. S. 443, 458-464. The well-delineated preconditions to its reasonable invocation are 1) probable cause to believe that the vehicle contains evidence of crime and 2) exigent circumstances.

## PROBABLE CAUSE TO BELIEVE THAT THE AUTOMOBILE CONTAINED EVIDENCE OF CRIME

A number of factors contributed to the sum total of probable cause:

A. *The Unities of Time and Place*

The appellants were stopped at a point some three to three and one-half miles by road from the crime scene. They were stopped within a range of six to ten minutes after the crime had occurred. They were stopped proceeding away from the scene of the crime specifically and out of Sparrows Point generally. These are, to be sure, not self-sufficient factors, but they are compatible with the appellants' guilt and add some weight to the equation when considered along with the other indications.

B. *Race, Sex, Age, and Neighborhood Demography*

The perpetrators of the crime were known to be Negroes; all three occupants of the car were Negroes. The perpetrators of the crime were known to be males; all three occupants of the car were males. The perpetrators of the crime were described as being in their early or mid-twenties; all three occupants of the car were in their early-to-mid-twenties. They were, moreover, Negroes leaving a predominantly white neighborhood. In that demographic setting, they represent a smaller population sample, within which the other identifying factors may concur, than they would in a predominantly Negro neighborhood, where the random chance of such concurrence would have a larger field of possibilities in which to operate. To the extent to which their presence in the neighborhood was more atypical than typical, to

such an extent is the likelihood of mere coincidence diminished when all the other identifying factors do concur.

### C. *The Description of the Clothing*

Probable cause need not be measured as of the moment when the officers first approached the suspect automobile. The initial stopping was an accosting, freely permitted by the laws regulating the operation of motor vehicles. Officer Lucas had put out over the airwaves the description of one of the perpetrators as wearing a green, Army fatigue jacket. Once Officer Hafer had stopped the car and observed its occupants, he noticed that King was wearing a "green Army-type jacket"—variously described as being "fatigue type" or being "more of an overcoat." This observation rightly entered the equation.

### D. *The Description of the Car*

Officer Lucas had radioed the alert for a yellow and black Duster. The suspect vehicle was a yellow and black Dodge Coronet. The concurrence of the yellow and black color combination is of realistic significance. The possible mistaking of one automobile make for another makes the Duster-Coronet disparity, we think, of only slight countervailing significance.

Upon our constitutionally-mandated independent review, we are persuaded that when Officer Hafer observed a yellow and black automobile proceeding out of Sparrows Point a few minutes after a robbery had been perpetrated a few miles away in Sparrows Point, which automobile was occupied by Negro males in their early-to-mid-twenties, one of whom was wearing a green Army jacket—all of which matched his radioed lookout—he had probable cause to believe that that automobile contained evidence of the robbery.

The only question that gives us pause is whether the description of the getaway vehicle is a factor which may properly be considered in the probable cause equation. The problem is posed by *Whiteley v. Warden of Wyoming*

*Penitentiary,* 401 U. S. 560, whereof we said in *Peterson, Deal and Hunt v. State,* 15 Md. App. 478, at 487:

> "The immediate holding of *Whiteley* was that, just as a justification for police action is not diminished in transmission, neither is it enhanced. If the justification is adequate at the point where the message is transmitted, it is no less so at the point where the message is received. Conversely, if the justification is inadequate at the point where the message is transmitted, that inadequacy endures and will not somehow be dissipated on the wires or on the airwaves. In transmission nothing is lost and nothing is gained."

The hurdle to be surmounted is that before Officer Hafer or Officer Malinowski might properly consider the description of the yellow and black automobile, that description must have been validly gathered by Officer Lucas back at the crime scene. *Hebron v. State,* 13 Md. App. 134; *Sands v. State,* 9 Md. App. 71; *Peterson v. State, supra.*

The Assistant State's Attorney properly sought to explore and Officer Lucas properly sought to furnish the details as to how he (Lucas) came upon the information that the robbers were getting away in a yellow and black automobile. Counsel for both appellants objected and the trial court sustained the objections:

> ". . . Did you broadcast anything else in addition to that?
> A. Yes, sir. Information was received from a subject, that did not identify himself, that the subjects were seen entering—
> MR. MIX: Objection.
> MR. HAHN: Objection.
> THE COURT: Sustained.
> As a result of what you put over the air, officer, what happened—
> THE WITNESS: It was broadcast—

THE COURT: —that you yourself know about?
THE WITNESS: —that the vehicle responsible for it was a late model—
MR. MIX: Objection.
MR. HAHN: Objection.
THE COURT: Sustained."

Both the hearsay information about the automobile and the circumstances under which it was furnished had a critical bearing upon the question of probable cause. The testimony pertaining thereto should not have been aborted. The defect could have been fatal. Fortunately from the State's point of view, this resolute witness, even in the face of repeated efforts to stay his tongue, managed to blurt out enough gratuitous information to salvage the day.

Although Officer Lucas was not permitted to testify as to what he had been told by his unidentified informant, it is clear that, being the only information available to him about the car, that was what he passed on in his radio alert. From what Officer Hafer and Officer Malinowski received, we deduce what Officer Lucas transmitted; from what Officer Lucas transmitted, we deduce what Officer Lucas heard from the unidentified informant.

We think it clear, moreover, that the unidentified informant was a disinterested citizen-witness. In the scurry of activity in which, in the course of several minutes, Officer Lucas took a complaint from the robbery victim and took descriptions of the robbers from two neighbors, it is apparent that yet another individual excitedly communicated his own observation as to the description of the fleeing vehicle. Our lack of further information about him is not fatal under the circumstances. It was made clear in *Dawson v. State,* 14 Md. App. 18, 33-34, that the strictures of *Aguilar v. Texas,* 378 U. S. 108, and *Spinelli v. United States,* 393 U. S. 410, "are aimed primarily at unnamed police 'informers' rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime,

other disinterested civilian sources of information or other law enforcement officers. The members of this broad class are generally, but not universally, named. They are not from the criminal milieu." *Dawson*, p. 33.

That a different rationale must exist for establishing the reliability of citizen-informers than for establishing that of the more suspect and anonymous police informer is widely recognized in recent case law. An excellent analysis of the very different nature of this problem is found in *People v. Glaubman*, 485 P. 2d 711 (Colorado, 1971), wherein it was said at 716-717:

> ". . . The nature of informants, which are a necessary part of police work, is such that the common informant is hidden behind a cloak of anonymity. . . . More often than not, the informant is paid or provides information in exchange for immunity from prosecution for his own misdeeds.
>
> Our view, which is supported by a number of decisions, is that the citizen-informer, adviser, or reporter who acts openly to see that our laws are enforced should be encouraged, and his information should not be subjected to the same tests as are applied to the information of an ordinary informer."

In measuring this unnamed and disinterested witness against the standard of *Aguilar*, it is obvious that Officer Lucas knew absolutely nothing about his inherent credibility—his integrity—his reputation or his status as a truth-speaker. His demonstrable "credibility" was "absolute zero." The "veracity" prong of *Aguilar's* "two-pronged test" is, however, significantly phrased in the disjunctive. Even knowing nothing about the inherent "credibility" of a source of information, we may yet inquire, "Was the information furnished under circumstances giving reasonable assurances of trustworthiness?" If so, the information is "reliable," notwithstanding our total ignorance as to its source's "credibility."

In *Thompson v. State,* 16 Md. App. 560, we held a street seller of narcotics to be furnishing "reliable" information where he was, for all he knew, talking to one of his buyers, notwithstanding the utter absence of any demonstrated "credibility." We there analyzed the evolution of this doctrine of "reliability as an alternative to credibility" toward which the common law of Maryland has been tending, in fleshing out the constitutional mandate of *Aguilar's* "two-pronged test":

"Although the rationale was not always neatly pigeonholed for convenience of later analytic synthesis, and although additional reasons based on practical necessity were sometimes advanced, the decisions of the Court of Appeals and of this Court have long portended that hearsay information may be furnished under circumstances reasonably insuring its reliability, even absent any knowledge as to its source's credibility. *Jones v. State,* 242 Md. 95, 100-101 (reliable information furnished by a rape victim, a named witness, and several other unidentified witnesses) ; *Taylor v. State,* 238 Md. 424, 429-431 (reliable information furnished by an unidentified witness to a robbery) ; *Evans v. State,* 11 Md. App. 451, 455-459 (reliable information furnished by an unknown robbery victim) ; *Ward v. State,* 9 Md. App. 583, 590-592 (reliable information furnished by two cleaning maids at a motel who observed narcotics in a motel room) ; *Knight v. State,* 7 Md. App. 282, 285-286 (reliable information furnished by two witnesses to a crime) ; *Edwards v. State,* 7 Md. App. 108, 112, f. 1 (reliable information furnished by one confessing to a crime, in the course of which confession he implicated another) ; *Grimm v. State,* 6 Md. App. 321, 326-328 (reliable information furnished by a taxicab driver) ; *Boone v. State,* 2 Md. App. 80, 93 (reliable information furnished by one confess-

ing to a crime, which confession implicated another)."

In the excitement of a crowd's gathering at a crime scene, a disinterested citizen hastily passed on his description of the getaway car. Even knowing nothing more about the man in terms of his inherent "credibility," we know that his information was furnished under circumstances making it otherwise "reliable." Thus, the factor of the yellow and black car was properly in the equation.

## EXIGENT CIRCUMSTANCES

Once probable cause is established, the question of exigency gives us no pause. The automobile had already moved past Officer Hafer and Officer Malinowski by the time they received their second radio transmission, which triggered them into action. The automobile was hailed down on a public street a few blocks from the Dundalk Avenue Bridge. The officers had the unquestioned right to search the automobile thoroughly then and there. They did make a cursory visual survey of its interior. Once that right to search vested, the officers' alternative chronology of seizing the car, transporting it to the Dundalk Police Station and then carrying out a more thorough search, under circumstances more commodious than on the side of a busy highway in the cold and dark of a December evening, in no way divests them of that right. *Chambers v. Maroney, supra. Chambers* points out that there is no difference between the right to seize a car and the right to search it. We have discussed the question of exigency at great length in *Peterson, Deal and Hunt v. State, supra,* 491-493; *Skinner v. State,* 16 Md. App. 116, 118-121; and *Bailey v. State,* 16 Md. App. 83, 102-108. The appellants argue strenuously that the removal of the three occupants of the automobile to the police station before the second search was carried out negated exigency. They ignore the clear teaching of *Bailey, supra,* at 104-105:

> "The appellant seeks to negate exigency by pointing out that the occupants of the station wagon were in police custody and were therefore unable to move the vehicle. He urges that the removal or absence of the probable driver or drivers of the vehicle dissipated the elements of 'ready mobility' and 'fleeting opportunity to search' . . .

> He will find no solace in the decisions of either the Supreme Court or of this Court. The mere placing of a suspect vehicle's occupants in custody does not extinguish exigency, if it otherwise exists."

The appellants attempt to place themselves within the protective holding of *Coolidge v. New Hampshire, supra.* To do so is to strain the analogy to a filament. In *Coolidge,* the suspect automobile was immobilized upon a private driveway. Here, the suspect automobile was speeding away from a crime scene. In *Coolidge,* the probable cause had been in the hands of the police for several weeks. Here, the probable cause had been in the possession of the police for between ten and thirty seconds. In *Coolidge,* the identity of the car and its owner were well known. Here, the identity of the car and its owner were unknown. In *Coolidge,* moreover, a search warrant had actually been obtained. Its extreme facts make it virtually *sui generis,* and its future serviceability to defendants will almost certainly be in inverse proportion to the frequency with which they will seek to make it serve. The holding of *Coolidge* is little more than the truism that the police cannot, with good grace, claim to have been unable to have gotten a warrant when, in fact, they have gotten a warrant (albeit defective). As we said in *Bailey,* at 106-107:

> "All of the cases both before the Supreme Court and before this Court in which exigency has been held to exist contain, as does the case at bar, the important element of 'unforeseeability,'

which was singularly lacking in *Coolidge v. New Hampshire,* 403 U. S. 443. In that case, the only Supreme Court decision ever to disallow the warrantless search of an automobile on the basis of non-exigency, the police had had probable cause for the search of Coolidge's automobile for several weeks prior to its warrantless search. The opportunity to obtain a search warrant was literally established, *ipso facto,* by the actual obtaining of a search warrant. (It turned out to be defective.) To have argued the lack of opportunity to obtain a search warrant in *Coolidge* would have been an absurdity on its face."

## LEGAL SUFFICIENCY OF THE EVIDENCE

### A. *As to King*

In addition to the proximities of time and place and in addition to the physical evidence of gun and cash, the descriptions given by various witnesses at the crime scene tended to incriminate King. The victim, Mrs. Akers, could not make an identification. She had, however, described one of her assailants as wearing a green, Army surplus, fatigue jacket. Mrs. Delores Abbott, a neighbor, was parking her automobile near the store when the robbers came running out. She could not discern the features of the two men, but described one of them as wearing an Army-type trench coat. King was wearing such a coat when apprehended. In addition, Mrs. Inez Brittain, who lived across the street from the victimized store, was looking out the window and saw two individuals walking back and forth a number of times before entering the store, saw them enter, and saw them run from the store a few minutes later. She positively identified King as one of the two men. That identification by Mrs. Brittain alone would be legally sufficient to sustain a conviction. *Melia and Shelhorse v. State,* 5 Md. App. 354; *Jones v. State,* 10 Md. App. 420.

B. *As to Mobley*

Mobley was arrested in a getaway car, fleeing a crime scene a few minutes after the crime had been committed. He was in the presence of King, who was demonstrated to have been one of the robbers. Mobley was, furthermore, in joint exclusive possession of the holdup gun and of the stolen money, which had been stashed away just minutes before. *Boswell v. State,* 5 Md. App. 571; and see *Folk v. State,* 11 Md. App. 508. That possession of recently stolen goods would permit the fact finder to draw the inference that the possessor was the thief or, where the theft was compounded, that the possessor was the robber. *Booker v. State,* 225 Md. 183; *Graham v. State,* 6 Md. App. 458; *Sizemore v. State,* 5 Md. App. 507. Under all of the circumstances, if Mobley had an innocent explanation to rebut the inference, it was incumbent upon him to come forward with it. He did not do so.

Since the admissible evidence showed directly, or circumstantially, or supported a rational inference of, facts from which the trial judge could fairly be convinced, beyond a reasonable doubt, of the guilt of both appellants of armed robbery, the judge was not clearly erroneous in reaching those verdicts. *Williams v. State,* 5 Md. App. 450, 459; *Metz v. State,* 9 Md. App. 15, 23; Maryland Rule 1086.

*Judgments affirmed.*