934 A.2d 1046

Julian MADISON–SHEPPARD

v.

STATE of Maryland.

No. 598, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Nov. 2, 2007.

Merrilyn E. Ratliff (Sherrie B. Glasser, Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellant.

Sharon Stanley Street (Douglas F. Gansler, Attorney General, on the brief), Baltimore, for Appellee.

Panel: DAVIS, SALMON, WILLIAM W. WENNER, (Ret., Specially Assigned), JJ.

SALMON, Judge.

## I.

Julian Madison–Sheppard was arrested for cocaine possession in Cecil County on June 25, 2005. He filed a motion to suppress evidence prior to trial. The motion was denied, as was a motion to reconsider the denial. Thereafter, Madison–Sheppard proceeded to trial based on an agreed statement of facts. The court found the defendant guilty of possession of cocaine.

In this appeal, Madison–Sheppard makes four arguments in support of his contention that the warrantless search of his person by a police officer was illegal, and therefore the court erred in denying his motion to suppress the evidence seized as a result of the search. We agree with two [1] of Madison–Sheppard's arguments and shall reverse his conviction.

## II.

At the suppression hearing, Cecil County Deputy Sheriff James Roland was the only witness. His testimony is summarized below.

On June 25, 2005, Deputy Roland was on patrol in Elkton, Maryland, at approximately 1:15 p.m. when he received a radio alert to "be on the look out for" a suspect with an outstanding warrant for an attempted murder that occurred sometime that week. He was also advised that the suspect was "possibly armed and dangerous" and was believed to be "in the Elkton area." According to the broadcast, the suspect was a black male, approximately six feet tall, 180 pounds, with cornrow-style hair, and the crime, believed to have been committed by the suspect, occurred somewhere in the "Wind-

---

1. Whether the other arguments by appellant have merit need not be decided.

ing Brook" area, which is located in the Elkton mailing area but is outside the Elkton town limits.

Not long after hearing the broadcast, Deputy Roland saw appellant standing on a porch of a house [2] "[i]n the area of 215 Hollingsworth Manor" in Elkton. Appellant is an African–American male with cornrow hair and, to the deputy's eye, was about the same height and weight as the suspect (appellant turned out to be 5'10", 170 pounds). Believing that appellant might be the person suspected of attempted murder, Deputy Roland called for police backup.

When the second officer arrived, both Deputy Roland and the officer approached appellant; as they did so, appellant sat down on the porch steps. When Deputy Roland asked appellant for identification, appellant said that he did not have any. Appellant then became "very nervous and could not stand." [3] The officers, "for safety reasons," handcuffed appellant's arms behind his back.

After handcuffing appellant, Deputy Roland conducted a pat-down search for weapons. While patting down appellant's right pant leg, Deputy Roland detected "blunt objects" in his right front pocket. This caused Deputy Roland to "squeeze," "grab," and "grasp" the objects. According to Deputy Roland the objects were "jagged," "hard," and were "sliding back and forth" between his fingers. The material felt like it was made of plastic. Deputy Roland then asked appellant if he had any illegal drugs on him. Appellant gave no response.

Deputy Roland concluded that the objects he felt were crack cocaine. He then reached into appellant's right front pocket and removed a Ziploc baggie containing thirteen individual baggies of a white rock-like substance, which, based on Deputy Roland's experience, he believed to be cocaine. Appellant was arrested for possession of a controlled dangerous substance ("C.D.S."). Subsequent testing of the white rock-like

---

**2.** Deputy Roland never said who resided at the home.

**3.** It is unclear from the suppression hearing record whether Deputy Roland asked appellant to stand.

substance by the Maryland State Crime Laboratory revealed that it was crack cocaine.

## III.

At the suppression hearing, defense counsel maintained that the search of her client was illegal for four reasons, viz.:

1. At the time of the search, appellant was under arrest, even though the police did not have probable cause to arrest him, and therefore Deputy Roland's search incident to the arrest was illegal.

2. Even if appellant was not arrested prior to the search and was, as the State contended, subjected only to a *"Terry-*stop," the stop was illegal because when the police handcuffed appellant they did not have a "reasonable articulable suspicion" that appellant had committed any crime; because the stop was illegal, so was the search that followed it.

3. Even if appellant was subjected to a valid *"Terry* stop," the police had no right to frisk him for weapons because they had no legitimate ground to believe that he carried a weapon.

4. Even if the police were conducting a valid *Terry* pat down for weapons prior to finding the drugs, Deputy Roland exceeded the scope of a valid *Terry* pat down when he poked and probed appellant's pocket prior to seizing the CDS.

The motions judge ruled as follows:

The court has to consider the totality of all of the circumstances within the guidelines provided by *Terry v. Ohio,* 1968 Supreme Court case—later it's specifically adopted by our Court of Appeals—[in] the case of *Williams v. State* in 1973. And, of course, the bottom line holding in *Terry* and *Williams* is that if a police officer has reasonable articulable suspicion that an individual accosted is engaged in criminal activity or may have a weapon on him or her, a minimally intrusive search is permitted.

Now, the facts presented here, number one, there was a broadcast received by the deputy describing the physical characteristics of a certain individual. An individual with

those physical characteristics was observed shortly thereafter by the deputy, according to him, matching the description of the individual.

The individual was acting in a suspicious manner, unable to provide identification. Thereafter, the officer handcuffed the individual for his own safety and thereafter conducted a search to see if his suspicions regarding a weapon were, in fact, justified.... And during the course of that search the contraband was found.

In my reading of the case law, even though a weapon is not found, *it's not an unusual practice to empty all the pockets to see exactly what is there.* During the course of the search he did find the contraband.

The intrusion that occurred here, it can be argued, was self-inflicted by virtue of refusing to provide identification [4] as well as his physical reaction to being confronted, so I feel the intrusion was justified. It was minimal in nature.[5] The motion to suppress is denied.

(Emphasis added.)

A motion for reconsideration was filed. The merits of the motion were addressed in open court by the motions judge who said:

I differ ... [with defense counsel's position that the police did not have reasonable articulable suspicion to stop appellant] in that we have a black male in Hollingsworth Manor with a cornrow hairdo, *which is rather unique and unusual.* The description issued was a black male with corn-row, six foot—approximately six-foot—feet tall, 180 pounds. The defendant is five-foot-ten, 170 pounds. *So I think he was within a unique group, especially considering the fact that Cecil County only has a four percent black population, to*

---

**4.** According to Deputy Roland's testimony, appellant did not "refuse[ ] to provide identification"—he testified that appellant said he did not have any.

**5.** Handcuffing an individual is plainly not a "minimal" intrusion.

*sanction the stop as being constitutional. At least in my opinion, it is a somewhat unique situation.*

The second prong of the argument, of course, troubled me somewhat more because of the *Minnesota v. Dickerson* case where after a pat-down, if there is no disclosure or indication of a weapon being present to the sense of touch, you know, manipulation of the object is prohibited to ascertain if it could be something else that was illegal. But what troubles me, that's a very narrow distinction.

Here we had an individual who was, well, he was acting suspiciously. He was nervous and couldn't stand still, would not provide identification, was placed in handcuffs and thereafter, the officer patted him *down and admittedly manipulated when he felt something in his pocket, but the object that was found in his pocket was a plastic bag containing 13 individual baggies of crack cocaine.* And it just seems to be—which he immediately, through his sense of touch, recognized as being such, I believe, unless I'm recalling wrongly, just seems to me to be incongruous that if during the pat-down search one feels an object of this type or a pipe or a spoon or a hypodermic needle, because none of those things are weapons he has to stop his pat-down search. I could be wrong, but it just doesn't seem right to me. And I could very well be wrong, but I'm just going on my gut reaction to this whole situation. I'm going to deny the motion.

(Emphasis added.)

In this appeal, appellant raises the same contentions regarding the legality of the search of his person as he did below. Because they are dispositive, we shall consider only two of appellant's contentions, i.e., (1) that the search was illegal because the deputy, prior to the time he searched appellant, did not have a "reasonable articulable suspicion" that appellant had committed a crime or was about to commit one and (2) even assuming that appellant was subjected to a valid *Terry* frisk, the officers exceeded the permissible scope of such a search. Therefore, the seizure of the drugs was illegal.

## IV.

### Standard of Review

 When reviewing a circuit court's disposition of a motion to suppress evidence, we only consider the evidence contained in the record of the suppression hearing. *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129 (2007). We must view the evidence and draw all inferences in the light most favorable to the party prevailing on the motion, in this case the State. *Id.*

 When conflicts in the evidence exist, great deference is accorded the motions judge's determination, unless the factual determinations are shown to be clearly erroneous. *Id.* In the case at hand, there were no conflicts in the evidence because only one witness testified, and his testimony was not contradicted.

 We make our " 'own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case.' " *Id.* at 499, 924 A.2d 1129 (quoting *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996)).

## V.

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ..." U.S. CONST. amend. IV; *see also Longshore*, 399 Md. at 500, 924 A.2d 1129.

 This constitutional guarantee is subject only to a few limited exceptions when the search or seizure is "conducted outside the judicial process, without prior approval by judge or magistrate." *Minnesota v. Dickerson*, 508 U.S. 366, 374, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting *Katz v. United*

*States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (internal quotations omitted)).

One of the exceptions to the warrant requirement was announced in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the Court held that a police officer may make a brief investigatory stop of an individual, without an arrest warrant, so long as the officer has a "reasonable, articulable suspicion" that a crime is being committed, has been committed or is about to be committed by the person stopped. *Id.* at 30, 88 S.Ct. 1868.

■ The "reasonable articulable suspicion standard" announced in *Terry* is less demanding than the probable cause standard used to justify a warrantless arrest; it is, however, something more than a police officer's hunch. *See Sykes v. State,* 166 Md.App. 206, 217, 887 A.2d 1095 (2005).

In determining whether reasonable articulable suspicion exists that would justify a *Terry* stop in situations such as the one here presented, appellate courts of this state frequently consider the six factors discussed in 4 Wayne R. LaFave, Criminal Procedure § 3.8(d), at 244–45 (2d ed.1999). *See Stokes v. State,* 362 Md. 407, 765 A.2d 612 (2001); *Cartnail v. State,* 359 Md. 272, 753 A.2d 519 (2000); *Sykes,* 166 Md.App. at 217, 887 A.2d 1095. The six LaFave factors are:

(1) the *particularity of the description* of the offender or the vehicle in which he fled;

(2) the *size of the area* in which the offender might be found, as indicated by such facts as the *elapsed time* since the time occurred;

(3) the *number of persons* about *in that area;*

(4) the known or probable direction of the offender's flight;

(5) *observed activity* by the particular person stopped; and

(6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

(Emphasis added.)

We shall consider the factors, *seriatim.*

### A.

■ The particularity of the description of the offender is a critical factor in ascertaining whether reasonable articulable suspicion exists. In analyzing this factor, the descriptions at play in *Cartnail; Stokes; Collins v. State,* 376 Md. 359, 829 A.2d 992 (2003); and *Craig v. State,* 148 Md.App. 670, 814 A.2d 41 (2002), are illustrative.

In *Cartnail,* the police received an anonymous tip that three black males were involved in the robbery of a Quality Inn Hotel and had fled the scene in a gold or tan Mazda. 359 Md. at 277, 753 A.2d 519. Over an hour later, the officer stopped a gold Nissan driven by a black male who was accompanied by a black male passenger. *Id.* at 277–78, 753 A.2d 519. The Court held that the description of the individuals was not sufficiently particular, *id.* at 289–90, 753 A.2d 519, because the only matching features were the gender and race of the person stopped, and color of the car in which they rode. *Id.* at 289–90, 753 A.2d 519. The *Cartnail* Court said:

> We hold that the record of the suppression hearing in the present case fails to establish that a reasonable and prudent police officer would have had reasonable suspicion to stop Petitioner and, therefore, the stop was constitutionally illegal under the Fourth Amendment. There is no question that the police officer in this case was operating on a "hunch" that Petitioner and his passenger may have been two of the three suspects associated with the reported robbery of the Quality Inn.

*Id.*

In *Stokes, supra,* a police broadcast described an armed robbery suspect as "a black male wearing a black tee shirt." 362 Md. at 410, 765 A.2d 612. Defendant, a black male wearing dark clothing, drove into a parking lot near the crime scene roughly thirty minutes after the broadcast. *Id.* The *Stokes* Court held that a reasonable, articulable suspicion to stop the defendant did not exist because the description was "far too generic" and "sparse at best." *Id.* at 425, 765 A.2d 612. In addition, the Court stressed that the State did not put

forth any evidence to support a conclusion that the presence of a black male in the neighborhood where the stop occurred was atypical. *Id.* at 418, 765 A.2d 612.

In the case at hand, the State put forth no evidence showing that the presence of a black male in the Hollingsworth section of Elkton was in any way unusual. Nevertheless, the State stresses the motions court's comment that only four percent of Cecil County's population is African American. Assuming, *arguendo*, that a motions judge can legitimately take judicial notice of demographic information of this type, the statistic relied upon, standing alone, is meaningless. The court did not take judicial notice of (and we have no way of determining) the percentage of African Americans who live in the section of Elkton where appellant was stopped.

What the Court said in *Mobley & King v. State*, 270 Md. 76, 82 n. 1, 310 A.2d 803 (1973), is instructive:

> The [C]ourt [of Special Appeals] also noted that the [N]egro occupants of the vehicle were stopped in a predominantly white neighborhood and that in that demographic setting "they represent a smaller population sample, within which the other identifying factors may concur, than they would in a predominantly Negro neighborhood, where the random chance of such concurrence would have a larger field of possibilities in which to operate." From this, the court concluded: "To the extent to which their presence in the neighborhood was more atypical than typical, to such an extent is the likelihood of mere coincidence diminished when all other identifying factors do concur." *King and Mobley v. State,* ... 16 Md.App. [546,] 551–552, 298 A.2d 446 ... [ (1973) ]. However sound the court's conclusion may have been, there is no evidence in the record establishing that Sparrows Point is a predominantly white neighborhood and we decline to take judicial notice of that asserted fact.

As mentioned earlier, the motions judge indicated that he believed that it was "rather unique and unusual" for a black male to "have a cornrow hairdo." No evidence was presented at the motions hearing to support the court's belief that such a

hairdo was either "unique" or "unusual" among African Americans, and this plainly is not a "fact" of which a court can take judicial notice.

The *Collins* and *Craig* cases illustrate situations where the description of a criminal suspect, when coupled with other factors, were determined to justify a *"Terry* stop." In *Collins*, after a High's convenience store was robbed, a "lookout was broadcast describing the suspect as a black male, 5'8", 160 lbs, wearing a black "nubbie" hat [6] and a long-sleeved gray shirt with stripes." 376 Md. at 363, 829 A.2d 992. The store clerk who relayed this information to the police also advised that the robber had "just left" on foot and was armed. *Id.* The appellant, Collins, did not match all of the characteristics of the suspect (he was six feet, 180 pounds) but matched the predominance of them.[7] *Id.* at 370, 829 A.2d 992. The *Collins* Court stated that the strength of the other matching factors justified a holding that reasonable suspicion existed. *Id.*

In *Collins*, the disparities in the description were outweighed by the fact that Collins was seen shortly after the crime in the immediate vicinity of the place where the crime was committed. *Id.* Moreover, the suspect was found, just as the clerk indicated, walking away from the store. *Id.* In addition, there was no one else in the vicinity with a comparable description. *Id.* These matching characteristics, coupled with Collins' peculiar actions (changing direction upon spotting the police car) all supported the existence of a reasonable suspicion. *Id.*

---

**6.** A "nubbie" hat is a knitted hat worn in cold weather and was compared in *Collins* to a watch hat worn by Navy or merchant sailors. *Collins,* 376 Md. at 363 n. 2, 829 A.2d 992.

**7.** The Court noted that, although the description was slightly imprecise as to defendant's height and weight, the critical issue was the strength of the factors that did coalesce. For support, the Court quoted Professor LaFave: "investigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by victims or witnesses may be in error." *Id.* at 370, 829 A.2d 992 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(g) at 201–202 (3d ed.1996)).

In *Craig,* this Court dealt with a reasonable articulable suspicion issue involving a felony theft suspect. 148 Md.App. at 684, 814 A.2d 41. The suspect was described as a black male, in his twenties, 5'4", wearing a blue baseball cap and a black or blue shirt with white writing on it, and carrying a black bag. *Id.* Within minutes of the broadcast a suspect was located who matched the aforementioned description. *Id.* The *Craig* Court held that the officer who stopped appellant (Montgomery County Police Officer William Hill) had a reasonable articulable suspicion sufficient to detain the petitioner, Renard Craig. The Court explained:

> Hill heard three dispatch radio calls. Each stated that individuals from an office high-rise at 7910 Woodmont Avenue, Bethesda, observed a black male, in his twenties, approximately 5'4", wearing a blue ball cap, a black shirt with white writing and carrying a black bag, was acting suspicious. The reports also stated that the description matched that of a suspect on a burglary flyer that Hill had helped create. When Hill observed Craig exit from the elevator, he immediately noticed that Craig matched the descriptions from dispatch. Craig's reaction, upon making eye contact with Hill, raised more suspicions in Hill. Under the circumstances, the information Hill received from dispatch, and from the other two officers, adequately formed a basis for his articulable suspicion that Craig may have been involved in some criminal activity. This belief by Hill was supported further by his observations when he observed Craig's reactions upon making eye contact at the moment of their encounter. We find that, under the totality of the circumstances, Hill possessed a reasonable and articulable suspicion to believe that Craig may have been involved in theft.

Hill received a particularized description of the person who was thought to be the person described in the flyer. The area in which the suspect might be found was limited to one building, albeit with several levels. The time between the alert and his sighting of Craig was minutes (as contrasted with more than one hour in *Cartnail*). There were

relatively few other persons in the area. The direction of his movement, after the sighting, and report, was limited— he could exit the building only by the elevator or a stair well.

*Id.*

In the case at hand, LaFave's "particularity of the description" factor does not favor the State. As in *Cartnail* and *Stokes,* the description at issue was not "sufficiently unique to permit a reasonable degree of selectivity" because it could apply to a large segment of African American male population. LaFave, Search and Seizure 9.4(g) at 198.

### B.

The size of the area in which the offender might be found, coupled with the elapsed time since the crime occurred, ofttimes is a factor considered when attempting to ascertain whether the officers had the requisite reasonable suspicion. LaFave, Criminal Procedure § 3.8(d) at 244–45. The Court in *Stokes* applied this factor when it observed that "there is a significant difference between spotting a suspect within minutes of a crime, as opposed to an hour later." 362 Md. at 425, 765 A.2d 612. The "time and spatial relation to the stop" is critical as is the "radius of possible flight" in determining the existence, vel non, of reasonable articulable suspicion. *Id.; see also* LaFave, Search and Seizure § 9.4(g) at 204.

In *Collins, Craig,* and *Sykes,* all cases where reasonable suspicion was found to exist, the defendants were stopped in a precise area, consistent with the broadcast, and within minutes after the crime occurred.[8] Unlike *Craig,* where the area in which the suspect was stopped was limited to one building, or *Sykes,* where the suspects were seen running on a trail behind an apartment complex, here, the area of the search was far more encompassing (i.e., "the Elkton area"). *See Craig,* 148

---

**8.** In *Craig, Collins,* and *Sykes,* the time difference between the occurrence of the crime and the stop ranged from "within minutes," 8–12 minutes, and 16 minutes, respectively.

Md.App. at 684, 814 A.2d 41; *Sykes,* 166 Md.App. at 221, 887 A.2d 1095. Moreover, in the case at hand, the suspect was wanted in connection with an attempted murder that occurred "somewhere in the Winding Brook area." Appellant was seized in the Hollingsworth Manor area, which, as Deputy Roland conceded, "isn't anywhere close" to Winding Brook.

The broadcast, in addition, pointed out that the crime occurred sometime "that week." The area of possible flight after a week's time could be enormous.

### C.

The number of persons in the area where appellant was stopped may be important when examining the totality of the circumstances encompassing the stop. LaFave, Criminal Procedure § 3.8(d) at 244–45. In *Stokes,* defendant was the only person found in a parking lot at 10 p.m. in a residential neighborhood, 362 Md. at 410–11, 765 A.2d 612, but the State did not put forth any evidence to suggest that the presence of a black man in that neighborhood was unusual. *Id.* at 418, 765 A.2d 612. The Court held in *Stokes* that this factor did not support the State's position that the officer had a reasonable articulable suspicion to stop the petitioner.

In the case *sub judice,* appellant was stopped in a residential neighborhood while on "the front steps" of a house in Elkton. The State offered no direct or circumstantial evidence to suggest that the presence of a black man in this area was in any way atypical.

### D.

The fourth LaFave factor is the known or probable direction of the offender's flight. In this case, that factor is not applicable because the broadcast gave no indication as to the direction of the suspect's flight.

### E.

In some instances, an officer's observations of the suspect's actions may indicate, when taken in conjunction with other facts, the existence of a "particularized and objective

basis" for the stop. *Longshore,* 399 Md. at 507, 924 A.2d 1129 (quoting *[United States v.] Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); LaFave, Criminal Procedure § 3.8(d) at 244–45. In *Collins,* for instance, the suspect, upon spotting the police officer, immediately changed direction and headed toward a telephone booth. 376 Md. at 370, 829 A.2d 992. The *Collins* Court weighed this furtive action along with the following other factors: shortly after the robbery, the suspect was spotted in the immediate vicinity of the crime and was the only individual "on the deserted lot late on a winter night." *Id.* The *Collins* Court held that the officer was justified in stopping Collins to "either confirm or dispel his reasonable suspicion that Collins might be the person who robbed High's store." *Id.* at 372, 829 A.2d 992.

It is true, as the State points out, that appellant became "very nervous" when confronted by Deputy Roland. Becoming nervous when confronted by a police officer is, however, common among even innocent individuals and is certainly not determinative when the issue is whether a reasonable suspicion exists. For that reason, the Court of Appeals has cautioned against " 'placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion.' " *Longshore,* 399 Md. at 518, 924 A.2d 1129 (quoting *Ferris v. State,* 355 Md. 356, 389, 735 A.2d 491 (1999)).

The State further argues that the fact that appellant would not stand and had no identification, when combined with appellant's nervousness, gave rise to reasonable suspicion that appellant was the person mentioned in the broadcast. We disagree. Appellant was under no legal requirement to stand, nor was he obligated to carry identification on his person. And, as discussed in *Stokes,* an officer "cannot just say innocent conduct is suspicious, he or she *must provide a sufficient basis* for that conclusion." 362 Md. at 426, 765 A.2d 612 (emphasis added).

### F.

The final LaFave factor is inapplicable because the State offered no evidence to suggest the officers had knowledge that

appellant was involved in other criminal activity of any type. LaFave, Criminal Procedure § 3.8(d) at 244–45.

Under the totality of the circumstances, at the point where appellant was frisked, Deputy Roland did not have a reasonable articulable suspicion that appellant was the person who was wanted for attempted second-degree murder. Although appellant may have displayed signs of nervousness when approached, appellant did not know (as far as the record reveals) that the officer stopped him to ask questions about the attempted second-degree murder, and therefore his nervousness would not add support to the officers' hunch that appellant might have committed that crime. Without a reasonable articulable suspicion that appellant had committed that particular crime, Deputy Roland had no reason to believe that appellant carried a weapon, and therefore he could not lawfully perform a *Terry* frisk for weapons.

For the above reasons, we hold that Deputy Roland did not have the legal right to seize appellant (by handcuffing his arms behind his back). Because the seizure was illegal, so was the search that resulted therefrom.

## VI.

Even if we were to assume, *arguendo*, that the *Terry* frisk for weapons was justified legally, the evidence presented at the suppression hearing made it clear that Deputy Roland exceeded the permissible scope of such a search. Thus, the seizure of the drugs was illegal for that reason, as well.

On direct examination, the prosecutor and Deputy Roland had the following exchange:

Q: All right. And on this particular day, before I interrupted you, you testified that you were doing a pat down of the defendant. Can you please start from there?

A: As I was conducting the pat down, I went around the waistband. And as I went down the right pants—right side of the pant, I detected the blunt objects in his right front pocket, I immediately identified—

Q: When you say "blunt objects," can you articulate to the court what exactly it was you felt?

A. [The] crack rocks have a kind of distinct feel to them. They are sharp, jagged edges, very hard. I felt the objects. And as *I grabbed them, always squeeze the pants pocket.* You always feel for—trying to get a grasp for what it is, and I felt some kind of plastic material, something that was *sliding back and forth.*

Q: What significance would that have in regard to the detecting of C–D–S?

A: That's the way that most crack rocks are packaged.

Q: How are they packaged?

A: In Ziploc baggies.

Q: All right. Go ahead.

A: And as I felt that I asked the defendant, I said, Do you have, do you have any illegal drugs on you? And he would not answer. He would not comply with any of my questioning.

I removed the items. It was a Ziploc baggie containing 13 individually—

Q: Let me backtrack you for a second. Before you removed these items from his pocket, had you formed a conclusion, based on your background, training, and experience that you testified to, as to what those items were?

A: Yes.

Q: And what was your conclusion?

A: Identified them as crack cocaine.

(Emphasis added.)

The following questions were propounded and answers given by Deputy Roland on cross-examination:

Q: Then you said you did a pat down. And I noticed when you were testifying, you were rubbing your fingers together; is that correct?

A: Mm-hmm.

Q: Explain to the judge what crack cocaine felt like.

A: It has a hard—

Q: I'm not asking you that. When—I said when you were explaining it to the judge, you were pushing it between your fingers like you were feeling it; is that correct?

A: Right.

Q: When [the prosecutor] was asking you what it felt like, you said you need to grasp it, and you grasp like a fist; is that correct?

A: No, that's the procedure I go through as I contact—when conducting a pat down on the pants.

Q: So your procedure when you pat down is to grab and put a fist around it?

A: No, not a fist. Just a feel.

Q: Okay. Squeeze it?

A: Right.

Q: Manipulate it, see if it feels like what you think crack cocaine feels like?

A: I know what crack cocaine feels like.

Q: Not [that] you're trying to feel what's inside there?

A: When you pat down someone, that's the procedure; you feel—

[DEFENSE ATTORNEY]: Your Honor, for the record, he's doing this with his fingers (indicating), putting his fingers together like he's feeling, not open handed.

THE COURT: All right.

In *Dickerson, supra,* the Court said that a *Terry* pat down search is a "strictly circumscribed" search for weapons. 508 U.S. at 378, 113 S.Ct. 2130 (quoting *Terry,* 392 U.S. at 26, 88 S.Ct. 1868). In *Dickerson,* a police officer conducted a valid *Terry* frisk and found no weapon-like objects. *Id.* at 368–69, 113 S.Ct. 2130. The officer later testified that while conducting the pat down: "I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." *Id.* at 369, 113 S.Ct. 2130. Dickerson, the defendant, made a motion to suppress the cocaine seized as a result of the pat down but

was unsuccessful in the trial court. He was thereafter convicted based on the drugs found by the police. The Minnesota Court of Appeals reversed the lower court, and the reversal was upheld by the Minnesota Supreme Court. *Id.* The United States Supreme Court granted *certiorari* and said:

We think that this [plain view] doctrine has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search. The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point. *See Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *Texas v. Brown,* [460 U.S. 730,] 740, 103 S.Ct. [1535,] 1543 [, 75 L.Ed.2d 502 (1983) ]. The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment. *See [Arizona v.] Hicks,* 480 U.S. [321,] 326–327, 107 S.Ct. [1149,] 1153, 94 L.Ed.2d 347 [ (1987) ]; *Coolidge v. New Hampshire,* 403 U.S. 443, 467–468, 468–470, 91 S.Ct. 2022, 2028–2029, 2040, 29 L.Ed.2d 564 (1971) (opinion of Stewart, J.). *The same can be said of tactile discoveries of contraband. If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized* by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

\* \* \*

. . . [T]he dispositive question before this Court is whether the officer who conducted the search was acting within

the lawful bounds marked by *Terry* at the time he gained probable cause to believe that the lump in respondent's jacket was contraband. The State District Court did not make precise findings on this point, instead finding simply that the officer, after feeling "a small, hard object wrapped in plastic" in respondent's pocket, "formed the opinion that the object . . . was crack . . . cocaine." App. to Pet. for Cert. C–2. The District Court also noted that the officer made "no claim that he suspected this object to be a weapon," *id.,* at C–5, a finding affirmed on appeal, *see [State v. Dickerson,]* 469 N.W.2d [462,] 464 [ (Minn.App.1991) ] (the officer "never thought the lump was a weapon"). The Minnesota Supreme Court, after a close examination of the record, held that the officer's own testimony "belies any notion that he 'immediately' " recognized the lump as crack cocaine. *See [State v. Dickerson,]* 481 N.W.2d [840,] 844 [ (Minn.1992) ]. Rather, the court concluded, the officer determined that the lump was contraband *only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket"—a pocket which the officer already knew contained no weapon. Ibid.*

Under the State Supreme Court's interpretation of the record before it, it is clear that the court was correct in holding that the police officer in this case overstepped the bounds of the "strictly circumscribed" search for weapons allowed under *Terry. See Terry,* 392 U.S. at 26, 88 S.Ct. at 1882. Where, as here, "an officer who is executing a valid search for one item seizes a different item," this Court rightly "has been sensitive to the danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Texas v. Brown,* 460 U.S. at 748, 103 S.Ct. at 1546–1547 (Stevens, J., concurring in judgment). Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to "[t]he sole justification of the search [under *Terry:* ] . . . the protection of the police officer and others nearby." 392 U.S. at 29, 88 S.Ct. at 1884.

It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize, *see id.*, at 26, 88 S.Ct. at 1882, and that we have condemned in subsequent cases. *See Michigan v. Long*, 463 U.S. [1032,] 1049 n. 14, 103 S.Ct. [3469,] 3480–3481, 77 L.Ed.2d 1201 [ (1983) ]; *Sibron [v. New York]*, 392 U.S. [40,] 65–66, 88 S.Ct. [1889,] 1904, 20 L.Ed.2d 917 [ (1968) ].

*Id.* at 375–78, 113 S.Ct. 2130 (emphasis added).

*Dickerson* is here apposite. Appellant was patted down on a summer day, and there is no indication that he was not wearing clothing appropriate for that season. Deputy Roland's testimony made it clear that when he first felt appellant's outer clothing he did not feel "an object whose contour or mass ma[d]e[ ] its identity immediately apparent." *Id.* at 375, 113 S.Ct. 2130. Instead, the deputy knew the object was a CDS only after "squeezing, sliding, and otherwise manipulating" the bag in appellant's pocket. *Id.* at 378, 113 S.Ct. 2130.

This case is unlike *Sykes, supra*, where the suspect was stopped in late January wearing a winter coat, and the "touching techniques" were said to be no more than necessary to determine whether the suspect was carrying a weapon in his coat pocket. 166 Md.App. at 229–30, 887 A.2d 1095.

In response to appellant's *Minnesota v. Dickerson* contention, the State's argument has the virtue of brevity. Its only argument is this: "Deputy Roland consistently testified that he immediately identified the object [in appellant's pocket] as crack cocaine." This is not an accurate representation of Deputy Roland's testimony. He never once testified that he could identify the object as crack cocaine as soon as he felt it.

**JUDGMENT REVERSED; COSTS TO BE PAID BY CECIL COUNTY.**