947 A.2d 582

**Ernest James McDOWELL**

v.

**STATE of Maryland.**

**No. 2367, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

May 8, 2008.

Celia Anderson Davis and Stephen T. Harris** (Nancy S. Forster, Public Defender on the brief), Baltimore, for Appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.

Panel: DAVIS, WOODWARD and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

WOODWARD, Judge.

In the Circuit Court for Queen Anne's County, appellant, Ernest James McDowell, was charged with eight counts of narcotics-related offenses arising from the seizure of heroin and drug paraphernalia following a routine traffic stop on

---

** Student admitted pursuant to Rule 16.

December 20, 2005. At a motions hearing, appellant moved to suppress the evidence seized during the traffic stop and the statements that he made to the police. At the conclusion of the hearing, the judge took the case under advisement and, thereafter, issued a written opinion denying appellant's motion to suppress.

Appellant entered into an agreement with the State to proceed on an agreed statement of facts as to one count of unlawfully bringing a controlled dangerous substance into the State. The trial judge found the agreed facts sufficient to establish a factual basis for the charge and entered a verdict of guilty. On November 29, 2006, appellant was sentenced to 20 years' incarceration. The State entered a *nolle pros* to the remaining counts. This appeal followed.

The sole issue on appeal is whether the circuit court erred in denying appellant's motion to suppress the physical evidence. Finding no error, we shall affirm the judgment.

## BACKGROUND

On August 16, 2006, the hearing on the motion to suppress was held. Trooper Jeremiah Gussoni of the Maryland State Police, Centreville Barrack, was the only witness to testify. Based on his testimony, the following facts were adduced.

On December 20, 2005, at 11:40 p.m., Trooper Gussoni was traveling on Route 301 southbound in Queen Anne's County, Maryland when he observed a Chevy pickup truck driving erratically. Trooper Gussoni testified:

I observed that the vehicle would be [sic] traveling in lane one, the fast lane, would go across the edge line, back over the center line, the divided white line, into lane two, across the edge line, back into lane one; made several erratic moves like that.

At one point, two vehicles actually had to take evasive maneuvers to keep from being struck. I paced the vehicle about a half mile. [It] [w]as actually traveling down the center of both the lanes. I then activated my emergency lights and initiated a traffic stop on the vehicle.

The vehicle pulled over onto the right-hand shoulder of Route 301, a short distance before the 101 mile marker. It was very dark outside, and Trooper Gussoni described the area as "poorly lit." Trooper Gussoni observed two individuals in the vehicle, a driver and a front-seat passenger. When Trooper Gussoni approached the stopped vehicle, he advised the driver of his name and the reason for the stop. The driver apologized, explaining that the reason for his erratic driving was that he was tired. The driver identified himself as Hugh Collins Hines and appellant as his passenger. Appellant stated that it was his vehicle and that he was not carrying any identification.

During the stop, Trooper Gussoni observed that both Hines and appellant were nervous. In particular, Trooper Gussoni noticed that appellant, who was "staring straight, wouldn't look at me, was just—just appeared to me to be out of it." [1]

Trooper Gussoni returned to his vehicle and initiated a driver's license check on the status of Hines's license as well as a "check on both men." While sitting in his vehicle, Trooper Gussoni could see into appellant's vehicle, which was illuminated by the trooper's "multi-patrol vehicle spot light." Trooper Gussoni saw appellant "bending down, bending over. I could see him twisting his body. He made several movements like that. At that point, appearing that he might have been retrieving a weapon, I requested backup," which was approximately 15 to 20 minutes away.

Trooper Gussoni exited his patrol car, "went to the rear of [his] vehicle as not to cross [the vehicle's] high beam light," and walked up to the passenger side of the stopped pickup truck. Trooper Gussoni "stood just behind the passenger side window," where he "observed [appellant] reaching underneath his seat and then behind his seat into a gym bag." The gym bag was "a standard gym bag, two and a half feet by a foot

---

1. Trooper Gussoni asked Hines whether there was something wrong with appellant. No testimony was adduced regarding Hines's response.

and a half" and "undoubtedly" large enough to hold a weapon. Trooper Gussoni testified:

> At that point, I knocked on the window and spoke with [appellant]. I asked him what he was reaching for in the bag. I observed that the driver was now smoking a cigarette. [Appellant] had advised me that he was looking for cigarettes. I said, well, [appellant], are there any cigarettes in the bag and he said, well, no. I said what are you doing going into that bag. Again, figuring he had some type of weapon in there.

Appellant's nervous movements made Trooper Gussoni fearful that, based on his training at the State Police Academy, appellant had a weapon. Trooper Gussoni described appellant's movements as "indicative of someone trying to hide an item or retrieving a weapon or hiding a weapon." Trooper Gussoni elaborated: "A normal person is not going to reach underneath a seat, reach behind his seat into a bag and, then, when you ask about his [sic] contents, he is quickly moving away from that bag."

Because of his belief that "there was a weapon in the bag or [appellant] had secreted one," Trooper Gussoni asked appellant to exit the vehicle and bring the bag with him. Hines remained in the driver's seat while Trooper Gussoni directed appellant to "come to the rear of the vehicle, along with the bag." When asked "Why did you have [appellant] bring the bag out [of the car]?," Trooper Gussoni responded: "[F]rom the initial point of the traffic point [sic] how [appellant] was acting, the movements into the bag. I believe he had placed a weapon in there. It would be foolish of me to leave a bag with a weapon with another person in a vehicle with me outside." Trooper Gussoni further explained: "I was going to search the bag for a weapon. I was going to make sure there wasn't a gun in there or a knife or something that would harm me."

When appellant reached the rear of the vehicle, Trooper Gussoni expressed to appellant his fear that appellant was retrieving a weapon or hiding a weapon in the bag. Appellant responded: "[N]o, there's no weapons in there," after which

Trooper Gussoni asked appellant to open the bag. Appellant opened the bag "extremely wide from the top and the sides," and Trooper Gussoni observed several prescription bottles, personal hygiene items, clothing, used syringes, and a torn plastic baggy containing white powdery residue. Trooper Gussoni described the syringes: "You could tell from the syringes that they had been used. Some were partly drawn back. There was dry blood in there—what appeared to be dried blood at that point[.]"

Based on his training and expertise, Trooper Gussoni believed that the torn baggy was drug paraphernalia containing either cocaine or heroin, because "[t]hose are drugs that are heavily ... injected into the body." When backup arrived, Trooper Gussoni placed appellant under arrest and performed a search incident to arrest of appellant's person and the pickup truck. Several torn plastic baggies of powdery residue were found in the front pocket of appellant's jeans. Recovered from the vehicle were several torn plastic baggies, a spoon with residue on one side and burn marks on the other side, a syringe left in the glove box, 20 packages of mannite, an agent commonly used for cutting narcotics, and numerous bloody towels.

The gym bag was transported to the police barracks where it was searched further. Trooper Gussoni found two knotted plastic baggies containing 55.5 grams of a brownish substance, later determined to be heroin.

At the conclusion of the hearing, the motions judge took the case under advisement and, on September 7, 2006, issued a written opinion denying appellant's motion to suppress the physical evidence and the statements that he made to the police.[2] In a thorough and well-reasoned opinion, the motions court stated, in pertinent part:

---

**2.** At the motions hearing, Trooper Gussoni testified that, after appellant was given his *Miranda* warnings at the scene, Trooper Gussoni had a conversation with appellant. In that conversation, appellant admitted to having a very bad heroin addiction, stating that he shot 30 bags a day. Appellant stated that he sometimes sold the mannite, passing it off

Trooper Gussoni had reasonable articulable suspicion that [appellant] was armed and dangerous, thereby allowing him to conduct a frisk of [appellant], and of the gym bag. Trooper Gussoni described that at the time of the stop it was dark, late at night; the Trooper was conducting a traffic stop whereby he received an out of state driver's license from the driver who did not own the vehicle; the passenger in the right front passenger seat owned the car but was not driving it; the same passenger seemed "out of it"; [appellant] was making furtive gestures towards the rear seat of the car, and the gym bag was in the rear seat. [Appellant] was reaching for it during the traffic stop, and the bag was large enough to hold a handgun. These are not the inchoate, unparticularized facts present in *Derricott [v. State,* 327 Md. 582, 611 A.2d 592 (1992) ] or *Payne [v. State,* 65 Md.App. 566, 501 A.2d 484 (1985) ]. The Trooper here observed what he considered furtive gestures, suspicious activity by the passenger, in particular, while effectuating the stop and attempting to obtain information from and about the driver and passenger, which led him to believe that [appellant] possessed a weapon which might have harmed him. As in *Matoumba [v. State,* 162 Md.App. 39, 873 A.2d 386 (2005) ], Trooper Gussoni acted as a reasonably prudent man in the circumstances and was warranted in the belief that his safety was in danger. Upon re-approaching the car, on the passenger side, he observed [appellant] reaching for the bag. [Appellant] indicated, when questioned about the bag and his activities, that he wanted a cigarette but stated that there were none in the bag. It was then that the officer had [appellant] exit the vehicle with the bag. "When a police officer lawfully conducting a protective search reasonably believes a gun is concealed in the detainee's bag, the officer remains vulnerable and in danger if the

as heroin to people in North Carolina, and used it to cut heroin. Appellant also said that he needed to sell the heroin and the mannite to support his habit. We do not review the court's refusal to suppress appellant's statements to the police as that decision is not at issue in this appeal.

bag is returned and the detainee released at the conclusion of the investigative stop. It would be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Jordan [v. State,* 72 Md.App. 528, 531 A.2d 1028 (1987)]. Quite similarly, if Trooper Gussoni had taken a different course of action and allowed [appellant] to reenter the vehicle without further investigation into what he believed contained a weapon, the threat would not have been neutralized.

\* \* \*

The Trooper's order to [appellant] that he get out of the vehicle and for him to bring the bag with him was a protective 'frisk' of the passenger and the item, specifically narrowed in. scope to the specific bag which the Trooper believed contained the weapon.

\* \* \*

The Court finds the testimony of the Trooper fully credible.

\* \* \*

Consequently, the evidence obtained from [appellant's] gym bag and from any searches of [appellant's] person or automobile . . . will not be suppressed.

On October 5, 2006, appellant entered into an agreement with the State to proceed on an agreed statement of facts as to one count of unlawfully bringing a controlled dangerous substance into the State. At a hearing on October 10, 2006, the judge found that the agreed facts were sufficient to establish a factual basis for the charge and entered a verdict of guilty. On November 29, 2006, appellant was sentenced to 20 years' incarceration. The State entered a nolle prosse to the remaining counts.

Appellant timely noted this appeal.

## STANDARD OF REVIEW

 In *Hoerauf v. State*, 178 Md.App. 292, 306, 941 A.2d 1161 (2008), we recently discussed the appropriate standard for reviewing the denial of a motion to suppress:

When reviewing a circuit court's disposition of a motion to suppress evidence, we "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129 (2007). " '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " in this case, the State. *Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072 (2007) (quoting *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003)). We defer to the trial court's factual findings and uphold them unless they are shown to be clearly erroneous. *Id.* We also make our " 'own independent constitutional appraisal,' " by reviewing the relevant law and applying it to the facts and circumstances of this particular case. *Longshore*, 399 Md. at 499, 924 A.2d 1129 (quoting *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996)).

## DISCUSSION

Appellant maintains that the search of the gym bag was unlawful because it was "conducted without a warrant, without probable cause, and without authority under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889[ ] (1968) ... since there were no facts to suggest that [appellant] was armed." Consequently, appellant contends that the motions court should have suppressed the physical evidence. We disagree.

 The Fourth Amendment to the United States Constitution [3] is made applicable to the State of Maryland through

---

3. The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

the Due Process Clause of the Fourteenth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Owens v. State*, 322 Md. 616, 622, 589 A.2d 59 (1991), and "protects against unreasonable searches and seizures, including seizures that involve only a brief detention." *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612 (2001). "It is fundamental, under Federal and Maryland jurisprudence, that the detention of a motorist pursuant to a police traffic stop is a seizure encompassed by the Fourth Amendment." *Farewell v. State*, 150 Md.App. 540, 562, 822 A.2d 513 (2003); *see United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *State v. Green*, 375 Md. 595, 609, 826 A.2d 486 (2003); *Rowe v. State*, 363 Md. 424, 432, 769 A.2d 879 (2001); *Ferris v. State*, 355 Md. 356, 369, 735 A.2d 491 (1999); *Edwards v. State*, 143 Md.App. 155, 164, 792 A.2d 1197 (2002). Such a stop, however, does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

■ Furthermore, an officer making a traffic stop may order the passengers to get out of the car pending completion of the stop, because the "danger to an officer from a traffic stop[, which] is likely to be greater when there are passengers in addition to the driver," outweighs the "minimal" intrusion on the passenger. *Maryland v. Wilson*, 519 U.S. 408, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

■ "Although warrantless searches are presumptively unreasonable, because the touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions." *In re Calvin S.*, 175 Md.App. 516, 528, 930 A.2d 1099 (2007) (internal quotations omitted); *Madison–Sheppard v. State*, 177 Md.App. 165, 173, 934 A.2d 1046 (2007) ("This constitutional guarantee is subject only to a few limited

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. CONST. amend. IV.

exceptions when the search or seizure is 'conducted outside the judicial process, without prior approval by judge or magistrate.' " (internal quotation omitted)) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (footnote omitted)) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

One of the exceptions to the warrant requirement was announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the United States Supreme Court authorized police officers to conduct brief, investigatory stops of persons without a warrant or probable cause to arrest, so long as the officer has reasonable suspicion that a crime is being committed, has been committed, or is about to be committed by the individual stopped. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. Further, under *Terry*, when an officer justifiably believes that an individual is armed and presently dangerous, the officer may conduct a pat down search of an individual to determine whether the individual is carrying a weapon. *Id.* Specifically, the Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

*Id.* at 30–31, 88 S.Ct. 1868.

Thus the purpose of a protective search under *Terry* is not to discover evidence of a crime; rather, it allows

an officer to conduct an investigation without fear of violence. *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Accordingly, "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.*

In *Michigan v. Long,* 463 U.S. 1032, 1049, 1053, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court extended the reach of the *Terry* stop and frisk, holding that, in the context of a roadside encounter, a police officer may conduct a protective search for weapons not only of an individual, but also of the passenger compartment of a motor vehicle.

In *Long,* two deputy police officers were on patrol one evening when they noticed a car "traveling erratically and at excessive speed," eventually turning onto a side road and swerving into a ditch. *Id.* at 1035, 103 S.Ct. 3469. When the deputies approached the car to investigate, the driver and only occupant of the automobile met the officers at the rear of the vehicle, "which was protruding from the ditch onto the road." *Id.* at 1035–36, 103 S.Ct. 3469. The driver's door was left open. *Id.* at 1036, 103 S.Ct. 3469. The driver did not respond to the initial requests for his license or registration, and according to one of the deputies, "appeared to be under the influence of something." *Id.* at 1036, 103 S.Ct. 3469 (internal quotation omitted). Having produced his license, the driver was asked again for his registration, after which he turned from the officers and walked toward the open driver's door of the vehicle. *Id.* Walking behind the driver, the officers observed a large hunting knife on the floorboard of the car. *Id.* The officers stopped the driver and subjected him to a *Terry* protective pat down, but recovered no weapons. *Id.* One of the deputies then proceeded to search the vehicle for other weapons by shining his flashlight into the car without entering the vehicle. *Id.* When the officer noticed something protruding from under the front armrest, the officer knelt in the vehicle, lifted the armrest, and discovered an open pouch on the front seat. *Id.* Upon shining his flash light on the pouch, the officer saw that it contained what appeared to be

marijuana. *Id.* The driver was arrested for possession of marijuana. *Id.*

In considering whether a police officer may conduct a *Terry*-type search of the passenger compartment of a motor vehicle during a lawful investigatory stop of the occupant, the Court in *Long* emphasized a police officer's interest in self-protection and the protection of others. *Id.* at 1047–52, 103 S.Ct. 3469. The Court observed that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers," *id.* at 1047, 103 S.Ct. 3469, that "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed," *id.* at 1048, 103 S.Ct. 3469, and that "[i]f a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested." *Id.* at 1050, 103 S.Ct. 3469. In particular, the Court stressed that, when a stop "involves a police investigation 'at close range,'" the police officer "remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger." *Id.* at 1052, 103 S.Ct. 3469. The Court further opined:

> Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect.

*Id.* at 1049, 103 S.Ct. 3469.

The Court held that the police may search the passenger compartment of an automobile, "limited to those areas in which a weapon may be placed or hidden[ ] . . . if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049–50, 103 S.Ct. 3469 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868).

Turning to the facts before it, the Court concluded that the deputies had a reasonable belief that the defendant "posed a danger if he were permitted to reenter his vehicle." *Id.* at 1050, 103 S.Ct. 3469. The Court explained:

> The hour was late and the area rural. [The defendant] was driving his automobile at excessive speed, and his car swerved into a ditch. The officers had to repeat their questions to [the defendant], who appeared to be "under the influence" of some intoxicant. [The defendant] was not frisked until the officers observed that there was a large knife in the interior of the car into which [the defendant] was about to reenter. The subsequent search of the car was restricted to those areas to which [the defendant] would generally have immediate control, and that could contain a weapon. The trial court determined that the leather pouch containing marijuana could have contained a weapon. It is clear that the intrusion was "strictly circumscribed by the exigencies which justifi[ed] its initiation."

*Id.* at 1050–51, 103 S.Ct. 3469 (alteration in original) (citation omitted) (footnote omitted) (quoting *Terry*, 392 U.S. at 26, 88 S.Ct. 1868).

Within the framework of the foregoing principles, we address whether the court erred in denying appellant's motion to suppress the evidence seized from the gym bag.

## A.

### The Stop

In the instant case, it is clear that Trooper Gussoni's investigatory stop and temporary detention of appellant and the driver was constitutionally justified. Based on his observations of Hines's erratic driving, close encounters with other cars, and traveling down the center of two lanes, Trooper Gussoni properly stopped the vehicle for the traffic violations that he had observed. Furthermore, because the scope of an initial intrusion during a lawful traffic stop includes the removal of the passenger of the vehicle, Trooper Gussoni did not violate the Fourth Amendment's proscription against unrea-

sonable searches and seizures when he ordered appellant out of the vehicle. *See Wilson,* 519 U.S. at 415, 117 S.Ct. 882.

## B.

### Reasonable Articulable Suspicion

 The search of the gym bag during Trooper Gussoni's roadside traffic stop clearly falls within the parameters of *Long.* Accordingly, we must consider "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Long,* 463 U.S. at 1050, 103 S.Ct. 3469 (internal quotation omitted). Under *Long,* "[t]o engage in an area search, which is limited to seeking weapons, the officer must have an articulable suspicion that the suspect is potentially dangerous." *Id.* at 1052 n. 16, 103 S.Ct. 3469.

Relying on *Payne v. State,* 65 Md.App. 566, 501 A.2d 484 (1985), *cert. denied,* 305 Md. 621, 505 A.2d 1342 (1986), appellant argues that there was no reasonable articulable suspicion to perform a *Terry*-type search of the gym bag. According to appellant, the record reveals only Trooper Gussoni's belief that appellant was retrieving or concealing a weapon with "no facts supporting this belief." Therefore, appellant contends that Trooper Gussoni failed to provide specific and articulable facts that would reasonably warrant a belief that appellant was armed and dangerous.

 "The 'reasonable articulable suspicion standard' announced in *Terry* is less demanding than the probable cause standard used to justify a warrantless arrest." *Madison–Sheppard,* 177 Md.App. at 174, 934 A.2d 1046. Reasonable suspicion, however, requires that the police officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch[.]' " *Terry,* 392 U.S. at 27, 88 S.Ct. 1868; *see Sykes v. State,* 166 Md.App. 206, 217, 887 A.2d 1095 (2005), *cert. denied,* 393 Md. 162, 900 A.2d 207 (2006). The Court of Appeals has expounded on the reasonable suspicion standard:

There is no standardized litmus test that governs the reasonable suspicion standard, and any effort to compose one would undoubtedly be futile. The concept of reasonable suspicion purposefully is fluid because like probable cause, [it] is not readily, or even usefully, reduced to a neat set of legal rules. It is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.

*Cartnail v. State,* 359 Md. 272, 286, 753 A.2d 519 (2000) (alteration in original) (citations and internal quotations omitted).

Also, in reviewing a reasonable articulable suspicion determination, courts must look to the "totality of the circumstances." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation omitted). The Supreme Court in *Arvizu* stated:

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.

*Arvizu,* 534 U.S. at 274–75, 122 S.Ct. 744 (citations and internal quotations omitted).

The totality of the circumstances test was explained by former Chief Justice Burger in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981):

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each

of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, said that, [t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.

(Alteration in original) (emphasis, citations, and internal quotations omitted).

In both *Payne v. State*, 65 Md.App. 566, 501 A.2d 484 (1985) and *Matoumba v. State*, 162 Md.App. 39, 873 A.2d 386 (2005), *aff'd on other grounds*, 390 Md. 544, 890 A.2d 288 (2006), this Court addressed whether there existed specific and articulable facts from which a reasonable inference could be drawn that the defendant was armed and dangerous.

In *Matoumba*, two police officers were on a "crime suppression detail" one evening in west Baltimore when they stopped

a vehicle for traveling over the speed limit. 162 Md.App. at 43, 873 A.2d 386. Both officers exited their cruiser and approached the vehicle, one officer went to the driver's side and the other to the passenger side. *Id.* The officer who approached the passenger side observed the conduct of the appellant, who was seated in the right rear passenger seat. *Id.* According to that officer, the appellant "repeatedly looked back at the police cruiser" during the stop, "appeared to dip his right shoulder down toward the floor as [the officer] approached," "placed his right hand behind his back as [the officer] [ ] reached the rear passenger side," "maintained constant eye contact with [the officer]," and "demonstrated visibly shaking hands when commanded to show them." *Id.* When all of the occupants were ordered out of the vehicle and the appellant was frisked, one of the officers discovered a handgun in the appellant's back pocket. *Id.*

In considering whether the trial court erred in denying the appellant's motion to suppress, we addressed the appellant's argument that the officer's frisk was invalid under the Fourth Amendment, "because the officer lacked a reasonable articulable suspicion." *Id.* at 44, 873 A.2d 386. Specifically, the appellant argued that "no objectively reasonably prudent person" in the frisking officer's position would have believed that the appellant was armed. *Id.* at 47, 873 A.2d 386. Based on our review of the totality of the circumstances, and giving "due weight to [the] appellant's nervous conduct and obvious attempt to conceal some item behind his back, the dangerous nature of the area where the traffic stop occurred, and the initial reasonableness of the stop," we concluded that the officer had reasonable articulable suspicion to frisk the appellant. *Id.* at 50, 873 A.2d 386. Noting that the facts "surely warrant[ed] a prophylactic frisk to assure public and police officer safety," we stated that the officer "operated on more than a 'hunch' of danger." *Id.*

In *Payne,* the appellant was the driver of a vehicle, which was double-parked and impeding the flow of traffic in a high crime area of Baltimore City. 65 Md.App. at 568, 501 A.2d 484. After observing the appellant's vehicle, an officer patrolling

the area initiated a traffic stop. *Id.* As the officer pulled behind the appellant's vehicle, the appellant "was bending over as if picking-up or putting something on the floorboard." *Id.* When the officer approached the vehicle, he observed the appellant "quickly jam a black [leather] bag down to the floorboard ... concealing it from view." *Id.* (alteration in original). In response to the officer's request for his driver's license and registration, the appellant acted "very cool" and "deliberate." *Id.* (internal quotations omitted). During the encounter, however, the officer also observed the passenger seated in the vehicle, who "grew increasingly nervous," "was sitting very rigidly like he was scared," "kept shifting his hands," "kept looking out of the corners of his eyes," and looked at the officer and then in the direction of the black bag. *Id.* (internal quotation omitted). Thereafter, the officer asked the appellant to step out of the vehicle and to remove the black bag. *Id.* After patting the exterior of the bag and feeling the outline of a handgun, the officer opened the bag and discovered a handgun, cartridges, and a marijuana cigarette. *Id.* at 569, 501 A.2d 484.

Reviewing the constitutionality of the frisk, this Court concluded that the record contained "absolutely no 'specific and articulable facts' from which a reasonable inference can be drawn that [the appellant] was armed and dangerous." *Id.* at 574, 501 A.2d 484. We explained:

All [the officer] saw was a car double parked, a motion by [the appellant] during which [the appellant] either placed something on or took something from the floor, a jamming of a 'black bag ... to the floorboard,' and 'furtive' glances by a person who was a passenger in [the appellant's] car. How anyone can reasonably deduce from those facts that [the appellant] had a gun totally eludes us, unless [the officer] was clairvoyant. [The officer] might just as easily have concluded that [the appellant] had placed on the floor of the car narcotics, or pornographic matter, or receipts of a 'numbers' pickup, or money or jewelry. The list is innumerable.

*Id.* Accordingly, we concluded that the trial court erred in denying the appellant's motion to suppress the contraband. *Id.*

We conclude that the facts generating the reasonable suspicion in *Matoumba* are apposite to those in the instant case, while *Payne* is factually distinguishable.[4] Unlike the police officer in *Payne,* whose suspicion about the contents of the black leather bag derived from the appellant jamming the bag under the driver's seat and the *passenger* exhibiting increasingly nervous behavior, 65 Md.App. at 568, 501 A.2d 484, here Trouper Gussoni's suspicion was much more than a mere hunch.

As in *Matoumba,* Trooper Gussoni's testimony presented specific and articulable facts, under the particularized circumstances of his roadside encounter, from which he reasonably believed that appellant had immediate control of a weapon via the gym bag. The traffic stop was initiated late at night, in a very dark and "poorly lit" area. The trooper was alone on the shoulder of the road, about 15 to 20 minutes from any backup, and two individuals occupied the stopped pick up truck. The trooper observed that *both* the driver and appellant were nervous and appellant appeared to be "out of it." When Trooper Gussoni returned to his patrol vehicle, he saw appellant bending down and twisting his body several times. For fear that appellant was retrieving a weapon, Trooper Gussoni requested backup. When he approached the passenger side of the vehicle, Trooper Gussoni observed appellant reaching underneath his seat and then behind his seat into a gym bag. When asked what he was reaching for in the gym bag, appellant said that he was looking for cigarettes. But when the trooper asked him whether there were cigarettes in the

---

4. We note in passing that *Payne* was decided over 20 years ago and *Matoumba* only three years ago. The law governing *Terry* "stop and frisk" cases has changed dramatically during the past two decades. *See, e.g., Derricott v. State,* 327 Md. 582, 593–94, 611 A.2d 592 (1992); *see also* WAYNE R. LaFAVE, 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.6 (4th ed.2004) (exploring the evolution and expansion of the *Terry* stop and frisk).

bag, appellant said no—an answer that Trooper Gussoni interpreted as contradictory. Trooper Gussoni explained that a normal person would not reach underneath his or her seat, then behind the seat into a bag, and, when asked about the contents, "quickly mov[e] away from the bag." Based on his training at the State Police Academy, Trooper Gussoni formed a belief that appellant had a weapon, because appellant's movements were indicative of someone "retrieving a weapon or hiding a weapon."

In light of the trial court's finding that Trooper Gussoni's testimony was "fully credible," we conclude that the record contains sufficient specific and articulable facts from which a reasonable inference could be drawn that appellant was armed and dangerous and that a weapon may have been placed or hidden in the gym bag, which was in the passenger compartment and large enough to contain a weapon. Accordingly, under the teachings of Long and its progeny, Trooper Gussoni was permitted to order appellant to exit the vehicle with the gym bag and to conduct a *Terry*-type search of the bag for weapons.

## C.

### The Search Without a Pat Down

Appellant also challenges the scope of Trooper Gussoni's *Terry*-type search of the gym bag, arguing that "a search of a container is not permissible when its characteristics permit the law enforcement officer to pat it down to determine if a weapon is inside." Under *Terry* and *Long*, appellant contends that, if Trooper Gussoni suspected that the gym bag contained a weapon, "he should have separated [appellant] from the bag," and patted down the outside of the bag for weapons.[5] We disagree.

---

5. We reject appellant's suggestion that Trooper Gussoni should have separated appellant from the gym bag. The Supreme Court expressly stated in *Long* that an officer, who has to make a "quick decision as to how to protect himself and others from possible danger," need not "adopt alternate means to ensure [his] safety in order to avoid the

The Supreme Court in *Long* "had no occasion to consider whether, if the container is soft, a 'pat down' of it and discovery of a hard object within are prerequisites to search into the container, just as is true of [a] search of the suspect's person." WAYNE R. LAFAVE, 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.6 (4th ed.2004). Nevertheless, in *United States v. Shranklen*, 315 F.3d 959 (8th Cir.), *cert. denied, Fleming v. United States*, 538 U.S. 971, 123 S.Ct. 1774, 155 L.Ed.2d 529 (2003), the United States Court of Appeals for the Eighth Circuit held that, during a traffic stop where a police officer has reasonable articulable suspicion that an occupant of the vehicle is armed and dangerous, the officer is "not constitutionally required to pat down" a container found in the passenger compartment prior to opening and inspecting it. 315 F.3d at 963.

In *Shranklen*, the container was a black pouch that was retrieved by the police officer from under the front passenger seat. *Id.* at 960. The officer opened the pouch, searching for weapons, but instead found new and used syringes and illegal drugs. *Id.* The Court stated that "a person's privacy interest in an item such as a pouch, while protected by the Fourth Amendment, is not sacrosanct during an investigative traffic stop and must be balanced against the inherent risk of danger to officers at such stops." *Id.* at 964 (citation omitted). The Court reasoned:

Had the black pouch contained a weapon, there is no guarantee that merely feeling the pouch would have led [the police officer] to discover the weapon. For example, some type of padding could have enveloped the weapon, or the weapon could have been a pocket knife with an unexposed blade. It was therefore reasonable for [the police officer] to

intrusion involved in a *Terry* encounter." *Long*, 463 U.S. at 1052, 103 S.Ct. 3469 (internal quotation omitted).

open the pouch in order to inspect for weapons with his sense of sight and not solely with his sense of touch. *Id.*

Finally, the Court noted the similarity of the facts in *Shranklen* with those in *Long,* and stated that "the Supreme Court gave no indication that the officers should have patted down the pouch first." *Id.*

Similarly, by way of *dicta,* this Court has interpreted *Long* as not requiring an officer to first pat down a container found in the passenger compartment that may contain a weapon. *Watkins v. State,* 90 Md.App. 437, 444–45, 601 A.2d 1115, *cert. denied,* 327 Md. 80, 607 A.2d 921 (1992). We stated:

By virtue of this rule, when the police legally stop a person in an automobile, the police may "frisk" the automobile for weapons provided the police have reason to believe that a weapon is in the car, the police have reason to believe that the suspect is dangerous, and the police confine their search to areas of the passenger compartment "in which a weapon may be placed or hidden." **When in the course of such a search a container is found, the police may open and inspect the container without first patting it.**

*Id.* (emphasis added).

We find the reasoning of *Shranklen* to be persuasive. There simply is no assurance that merely feeling the outside of a container, which is capable of being physically manipulated, will reveal the presence of a weapon located inside. Only opening and inspecting the container will definitively remove the potential threat to the officer's safety. In addition, a constitutional rule requiring a pat down first of all containers will encounter practical difficulties in the field when a police officer is confronted with a container with both hard and soft sides, such as certain gym bags and back packs.

Finally, under the circumstances of the case *sub judice,* Trooper Gussoni's safety would have been compromised if he had been required to pat down the gym bag instead of directing appellant to open it. The traffic stop took place late at night in a poorly lighted area, with Trooper Gussoni the

only officer on the scene and backup about 15 to 20 minutes away. He had to control two nervous occupants of a vehicle, one of whom he came to reasonably believe was armed and dangerous. Trooper Gussoni also held the reasonable belief that there was a weapon in the gym bag located directly behind appellant in the vehicle. For Trooper Gussoni to have patted down the bag, he would have had to use his hands, thereby exposing his service weapon and inviting possible attack.

Therefore, we transform the *dicta* in *Watkins* into a holding that, when a *Terry*-type search for weapons of the passenger compartment of a motor vehicle is constitutionally permitted and, during such search, a container is found in which a weapon may have been placed or hidden, a police officer may open and inspect the container without first patting it down. Accordingly, Trooper Gussoni did not violate appellant's Fourth Amendment rights when he directed appellant to open the gym bag without first patting it down. Under *Long,* when a valid *Terry*-type search for weapons results in the discovery of illegal drugs and drug paraphernalia, the officer need not ignore the contraband, and "the Fourth Amendment does not require its suppression in such circumstances." *Long,* 463 U.S. at 1050, 103 S.Ct. 3469. The trial court did not err in denying appellant's motion to suppress.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**